FILED IN OPEN COURT
U.S.D.C. - Atlanta

JAN 05 2026

KEVIN P. WEIMER, Clerk
By: *[signature]*
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>KAREN L. BENNETT | Criminal Information<br><br>No. 1:25-CR-566 |

THE UNITED STATES ATTORNEY CHARGES THAT:

At all times material to this Information:

1. The defendant, KAREN L. BENNETT, lived in the Northern District of Georgia and served as the elected Georgia State House Representative for District 94, which includes portions of DeKalb and Gwinnett Counties.

2. Unemployment Insurance (UI) was a joint state and federal program that provided monetary benefits to eligible beneficiaries. UI payments were intended to provide temporary financial assistance to lawful workers who were unemployed through no fault of their own.

3. Beginning in or around March 2020, and in response to the COVID-19 pandemic, the Pandemic Unemployment Assistance Program (PUA) program was created to provide federally funded unemployment-related benefits to those whose employment was affected by COVID-19 but who were ineligible to receive regular UI benefits, such as those who were self-employed, gig workers, and 1099 independent contractors. To qualify for PUA, individuals had to first apply for and be denied UI benefits.

4. Additionally, federal supplements were available to those receiving UI or PUA benefits, including the Federal Pandemic Unemployment Compensation (FPUC), and the Lost Wages Assistance Program (LWAP).

5. In the State of Georgia, the Georgia Department of Labor (GA-DOL) administered the UI and PUA programs, along with the FPUC and LWA supplements, and the United States Department of Labor provided oversight and federal-level administration of the programs.

6. Those seeking UI or, if applicable, PUA benefits submitted online applications. Applicants had to answer specific questions to establish eligibility to receive UI or PUA benefits, including their name, work history, and mailing address, among other things. PUA applicants additionally had to self-certify that they met a COVID-19-related reason for being unemployed, partially employed, or unable to work and provide information about their 2019 earnings. Benefits were awarded on a weekly basis, and applicants were required to provide certifications for every week for which they wished to collect benefits.

7. The GA-DOL relied on the information in the applications to determine eligibility for UI and PUA benefits. Once an application was approved, UI or PUA benefits were most often issued either through a direct deposit into a designated account or a transfer to a pre-paid debit card.

8. On or about April 30, 2020, BENNETT applied for UI benefits. BENNETT was subsequently determined to be ineligible to receive UI benefits, and her application was denied.

9. On or about May 7, 2020, BENNETT applied for PUA benefits. In the PUA application she disclosed two employers: the Georgia General Assembly and Metro Therapy Providers, Inc. ("Metro Therapy"). Metro Therapy was a company owned by BENNETT. In the PUA application, with respect to Metro Therapy, BENNETT stated the following:

- Her work consisted of providing in-home physical therapy services.
- It was her primary occupation and primary means of livelihood.
- She was last able to work on April 10, 2020.
- The pandemic prevented her from performing any service in connection with that employment.
- She was "unable to reach my place of employment because of a quarantine imposed as a direct result of the COVID-19 public health emergency."
- She was unable to return to work because "[t]he policies of the program require strict Shelter in Place guidelines and person to person contact is not accepted."
- She would be able to provide documentation as proof of COVID-19 being the cause of her unemployment.
- "I certify the information provided is true and correct to the best of my knowledge and belief. I understand the law prescribes penalties, possible forfeiture of assistance, and/or criminal prosecution for misrepresentation or concealment of facts in order to obtain or increase assistance for myself or someone else."

10. In reality, BENNETT was not prevented from performing her work for Metro Therapy or reaching her place of employment because of COVID-19 quarantine. Before the pandemic her actual role with Metro Therapy was an administrative one and she worked from her home office; she did not provide in-

3

home services for clients. She was not prohibited from reaching her home office because of the pandemic. She was able to continue working as usual from her home to support Metro Therapy throughout the pandemic, and the therapists who provided actual services to clients were able to continue their work after a brief disruption.

11. Once approved for PUA benefits, BENNETT periodically submitted online certifications for every week for which she requested benefits. In each of those certifications, while she stated that she was receiving $300 per week from the General Assembly, she disclosed no other income. Specifically, she stated that she had not earned any self-employment or other wages from Metro Therapy or other employers for the week; that she was "able, available and actively seeking work during" the week; and that she was either "unable to reach my place of employment because of a quarantine imposed as a direct result of the COVID-19 public health emergency" or was "a self-employed/independent contractor/gig worker and have experienced a significant reduction of my customary or usual services because of COVID-19 public health emergency." She submitted such certifications for weeks in March through August 2020. However, in reality, BENNETT was not actively seeking work, BENNETT was not prevented from working for Metro Therapy because of a COVID-19 quarantine, and Metro Therapy was still operating and receiving income.

12. Additionally, on the PUA application and weekly certifications, BENNETT failed to disclose and concealed that she had separate employment

4

through a church and was receiving a paycheck from the church for $905 every week the entire time she was claiming PUA benefits.

13. As a result of the false application and certifications, BENNETT collected a total of $13,940 of PUA benefits and federal supplements to which she was not entitled.

## Count One
(18 U.S.C. § 1001 – False Statements)

14. On or about August 13, 2020, in the Northern District of Georgia, the defendant, KAREN L. BENNETT, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations in a matter within the jurisdiction of the executive branch of the Government of the United States on internet certifications to obtain funds administered by the U.S. Department of Labor in the form of unemployment benefits for the week ending August 8, 2020; that is, BENNETT stated that she only earned $300 that week, was actively seeking work that week, and "I am a self-employed/independent contractor/gig worker and have experienced a significant reduction of my customary or usual services because of COVID-19 public health emergency." The statements and representations were false because, as defendant BENNETT then and there knew, she earned at least $1,205 that week, was not actively seeking work, and was not prevented from working due to COVID-19.

All in violation of Title 18, United States Code, Section 1001.

## Forfeiture

15. Upon conviction of one or more of the offenses alleged in Count One of this Information, the defendant, KAREN L. BENNETT, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to the offenses, including, but not limited to, the following:

> MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained as a result of the offenses alleged in Count One of this Information.

16. If any property subject to forfeiture, as a result of any act or omission of the defendant:

   (a) cannot be located upon the exercise of due diligence;

   (b) has been transferred or sold to, or deposited with, a third party;

   (c) has been placed beyond the jurisdiction of the Court;

   (d) has been substantially diminished in value; or

   (e) has been commingled with other property which cannot be divided without difficulty;

the United States intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

THEODORE S. HERTZBERG
  *United States Attorney*

GARRETT L. BRADFORD
  *Assistant United States Attorney*
Georgia Bar No. 074374

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181